UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:16CV-151-JHM

CHS, INC.                                                                                              PLAINTIFF

V.

YELLOW BANKS RIVER TERMINAL, LLC                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on cross-motions for summary judgment [DN 21, DN 26]. Fully briefed, these matters are ripe for decision.

### I. BACKGROUND

Plaintiff, CHS, Inc., is a farmer-owned cooperative whose business includes purchasing fertilizer and distributing it to customers. Defendant, Yellow Banks River Terminal, LLC., operates a full-service river terminal located on the Ohio River in Owensboro, Kentucky. As part of its business, Yellow Banks loads, unloads, and warehouses bulk products on behalf of customers. CHS purchases fertilizer in bulk from around the country and arranges for the fertilizer to be delivered to the Yellow Banks's terminal. Once received at the terminal, the fertilizer is stored in warehouses until it can be sold and distributed to CHS customers. CHS does not physically handle the fertilizer, but instead contracts with Yellow Banks to handle it.

In the summer of 2014, CHS agreed to finance the construction of a new fertilizer storage warehouse at the Yellow Banks terminal ("New Warehouse"). In connection with the project, CHS and Yellow Banks entered into a Ground Sublease Agreement and an Operating Agreement. Under the Ground Sublease, CHS agreed to lease certain real estate from Yellow Banks at the terminal for the purpose of storing fertilizer products that are owned or controlled

by CHS. The Ground Sublease provided CHS the right to build the New Warehouse on this land. Construction of the New Warehouse was completed in June of 2015 at a total cost to CHS of approximately $4 million. Under the Operating Agreement, Yellow Banks agreed to "provide CHS with services to unload wholesale fertilizer products from river barges, to store and safeguard these products inside warehouses, and load out these products to trucks" at prices set forth in the Operating Agreement.

Yellow Banks uses front-end loaders to provide services to CHS at the terminal. On February 24, 2016, a Yellow Banks employee parked a Caterpillar front-end loader inside the New Warehouse after using it to provide services to CHS. Around 2:45 a.m. on February 25, 2016, the front-end loader ignited a fire inside the New Warehouse causing damage to the warehouse. Experts believed the fire started at the front-end loader's battery box.

After the fire, CHS engaged a structural engineer to investigate and provide restoration recommendations. In his report, the expert recommended that CHS remediate and restore fire damage to its New Warehouse, including damage to the roof, rafters, soffit, conveyor system, wood trusses, exterior siding, and interior storage bins. CHS demanded that Yellow Banks pay to remedy all of the fire damage. Yellow Banks refused. As a result, CHS obtained quotes for the remediation work, selected Blue Star Restoration to perform the work, and forwarded the quote for the work to Yellow Banks. Yellow Banks again refused. CHS retained Blue Star to complete the work. CHS paid Blue Star $146,865.30.

On November 23, 2016, CHS filed this civil action against Yellow Banks alleging breach of the Operating Agreement, breach of the Ground Sublease, and negligence. CHS seeks to recover the $146,865.30 paid to Blue Star in connection with the remediation work necessitated by the fire and costs, attorney's fees, pre-suit investigation expenses, and settlement effort

expenses. The parties have now filed cross-motions for summary judgment arguing that the Operating Agreement and the Ground Sublease place responsibility for the fire damage squarely on the other party.

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U .S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252.

The summary judgment standard does not change when a court is presented with cross-motions for summary judgment. Profit Pet v. Arthur Dogswell, LLC, 603 F.3d 308, 312 (6th Cir. 2010) (citing Taft Broadcasting Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)). "The fact that both parties have moved for summary judgment does not mean a court must grant judgment as a matter of law for one side or the other; rather, a 'court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" Id. (quoting Taft, 929 F.2d at 248).

### III. DISCUSSION

CHS alleges that under the Ground Sublease and the Operating Agreement, Yellow Banks contractually agreed to indemnify CHS and hold it harmless for all losses incurred by CHS as a result of the fire. Yellow Banks disagrees arguing that the indemnity provisions do not apply to this case. First, Yellow Banks argues that indemnification agreements apply only to third-party claims. Second, Yellow Banks maintains that the indemnification agreement applies only if Yellow Banks acted with ordinary or gross negligence. Finally, Yellow Banks's primary argument is that the Ground Sublease places the responsibility for the fire damage remediation on CHS. Yellow Banks contends that the Ground Sublease specifically required CHS to maintain fire insurance in the amounts equal to the full insurable value of the New Warehouse and improvements and permitted replacement of the New Warehouse building to be paid for with proceeds from the required insurance policy.

The issues raised in the parties' cross-motions for summary judgment are governed by principles of contract interpretation. Under Kentucky law, "the construction and interpretation of a contract including questions regarding ambiguity are questions of law to be decided by the Court." Hulda Schoening Family Trust v. Powertel/Kentucky Inc., 275 F. Supp. 2d 793, 794

(W.D. Ky. 2003) (citation omitted). "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself." Logan Fabricom, Inc. v. AOP Partnership LLP, 2006 WL 3759412, at *2 (Ky. App. Dec. 22, 2006). A court's analysis thus begins with a contract's four corners. See 3D Enters. Contracting Corp. v. Louisville and Jefferson County Metro. Sewer Dist., 174 S.W.3d 440 (Ky. 2005) (noting that when no ambiguity in a contract exists, a court should look "only as far as the four corners of the document to determine the parties' intentions"). As a rule, a contract "must be construed as a whole, giving effect to all parts and every word in it if possible." American Dairy Queen Corp. v. Fortune Street Research & Writing Inc., 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010).

"[I]n the absence of ambiguity a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." Frear v. P.T.A. Indus., Inc., 103 S.W.3d 99, 106 (Ky. 2003). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 385 (Ky. App. 2002). "The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." Id. "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." Id. "[O]nce a court determines that a contract is ambiguous, areas of dispute concerning the extrinsic evidence are factual issues and construction of the contract become subject to resolution by the fact-finder." Id.; see also Prime Finish, LLC v. ITW Deltar IPAC, 2017 WL 1823064, at *9 (E.D. Ky. May 5, 2017).

5

## A. Indemnification Agreements

CHS contends that in exchange for its agreement to finance the construction of the New Warehouse, Yellow Banks broadly agreed to defend, indemnify, and hold CHS harmless from all damages or losses: (1) "arising out of or resulting from" Yellow Banks's provision of services to CHS at the Yellow Banks terminal (Operating Agreement § 8); or (2) arising "directly or indirectly in connection with . . . any act or omission of" Yellow Banks (Ground Sublease § 11.) According to CHS, this obligation is triggered here because CHS's losses were caused by the fire, which was caused by Yellow Banks's loader, which was used to provide services to CHS at the terminal, and which Yellow Banks decided to park inside the New Warehouse overnight. CHS maintains that under both the Operating Agreement and Ground Sublease, indemnifiable losses include property or consequential damages arising from the fire ignited by Yellow Banks's front-end loader, plus expenses associated with investigating, settling, or litigating these indemnification claims, including attorney's fees.

Specifically, under Section 11 of the Ground Sublease, Yellow Banks agreed to:

> defend, indemnify and hold harmless [CHS] from and against any and all claims, demands, actions, suits, judgments, damages, losses, liability, costs and expenses (including, but not limited to reasonable attorneys' fees and consequential damages) that arise, directly or indirectly, in connection with: (a) any injury to person or property, loss of life, or other act or omission that occurs on the Yellow Banks Premises (excluding the Premises, unless caused by Lessor's gross negligence or willful misconduct); (b) any act or omission of Lessor or Lessor's agents, employees, contractors and licensees within the Yellow Banks Premises or otherwise . . . .

(Ground Sublease § 11.) The "Premises" is the land and easements on which the New Warehouse is built. (Id. at §§1,17, Ex. A.)

The Operating Agreement incorporates by reference the Ground Sublease Agreement and provides that both agreements shall commence and terminate simultaneously. Under Section 8

6

of the Operating Agreement, "each party (as such, the 'Indemnitor')" agreed to:

> indemnify, defend and hold harmless the other party and its affiliates, and their respective owners, directors, officers, employees, agents, representatives, successors and assigns from and against any and all claims, demands, causes of action, judgments, awards, assessments, damages, liabilities, losses, fines, penalties, deficiencies, interest and expenses (including, without limitation expenses of investigation, settlement, litigation and attorney's fees and cost incurred in connection therewith), including, without limitation, those alleged or incurred on account of injury to or death of persons or damage to property ("collectively, "Losses"), arising out of or resulting from: . . . (ii) the negligence or willful misconduct of Indemnitor or Indemnitor's employees, agents, contractors or representatives . . . . In addition, [Yellow Banks] agrees to indemnify, defend and hold harmless CHS and its affiliates, and their respective owners, directors, officers, employees, agents, representatives, successors and assigns from and against any and all Losses arising out of or resulting from the provision of the services contemplated by this Operating Agreement by [Yellow Banks] or [Yellow Banks'] employees, agents, contractors or representatives.

(Operating Agreement § 8.)

Yellow Banks argues that the above indemnity provisions apply only to third-party claims asserted against CHS. Yellow Banks further argues that the indemnification agreements apply only if Yellow Banks acted with ordinary or gross negligence.

### 1. *Direct Indemnity Claims between Parties*

In reviewing CHS's request for indemnification, the general principles of contract construction discussed above apply equally to indemnification agreements. Indemnity is "[a] duty to make good any loss, damage, or liability incurred by another[,]" and "arises from a promise by the indemnitor to safeguard or hold harmless a party against an existing or future loss, liability, or both." Frear v. P.T.A. Industries, Inc., 103 S.W.3d 99, 107 (Ky. 2003). See also Enerfab, Inc. v. Kentucky Power Co., 433 S.W.3d 363, 366 (Ky. App. 2014). While the terms indemnity and indemnification often times refer to reimbursement for liability to a third

7

party, Defendant cites no Kentucky case which limits indemnification to claims brought against the indemnitee by third parties.

In fact, "indemnification" is defined by Black's Law Dictionary (10th ed. 2014) as "[t]he action of compensating for loss or damage sustained." The verb "indemnify" means "[t]o reimburse (another) for a loss suffered because of a third party's or *one's own act* or default." Black's Law Dictionary 886 (10th ed. 2014) (emphasis added). "The mere fact that a provision in a contract uses the term indemnity or indemnification does not restrict that provision to third-party claims. Indemnity or indemnification can mean simply reimbursement." Patton v. TPI Petroleum, Inc., 356 F. Supp. 2d 921, 927 (E.D. Ark. 2005). See also Warren Prescriptions, Inc. v. Walgreens Co., 2017 WL 3334053, *4 (E.D. Mich. Aug. 4, 2017)("The fact that Plaintiffs seek to enforce the indemnification clause as between the parties, without third-party involvement, does not alone preclude Plaintiffs' claim."); Battelle Mem'l Inst. v. Nowsco Pipeline Servs., Inc., 56 F. Supp. 2d 944, 951 (S.D. Ohio 1999)("It is clear from both the Ohio and Sixth Circuit definitions of indemnification that a party wishing to narrow an indemnification clause to third-party damage is obligated to limit the scope of the clause expressly; and absent such express limitation, indemnification clauses may apply to damage suffered by the contracting parties themselves."); Pay(q)r, LLC v. Sibble, 2015 WL 9583034, at *12 (N.D. Ohio Dec. 31, 2015)("Absent an express limitation to third-party damage, courts in Ohio and the Sixth Circuit will read indemnification clauses to apply to damages caused by a party to the contract."); Bisson v. Reppel, 2015 WL 631386, at *6 (D. Vt. Feb. 12, 2015); Rand Const. Co. v. Dearborn Mid-West Conveyor Co., 944 F. Supp. 2d 1042, 1060 (D. Kan. 2013). "Indemnification, then, may encompass broader liability if the parties so intend." Trustees of Estate of Bishop v. Brewer Envtl. Indus., LLC, 2010 WL 11526872, at *8 (D. Haw. May 14,

2010).

In this case, section 11 of the Ground Sublease states that Yellow Banks, the Lessor, will "indemnify" CHS from any and all "damages, losses, . . . costs and expenses . . . that arise, directly or indirectly, in connection with any act or omission of Lessor or Lessor's agents, employees, contractors and licensees within the Yellow Banks Premises or otherwise . . . ." (Ground Sublease § 11(b).) Similarly, in section 8 of the Operating Agreement, Yellow Banks agreed to indemnify CHS "from and against any and all Losses [which includes property damage] arising out of or resulting from the provision of the services contemplated by this Operating Agreement by [Yellow Banks] or [Yellow Banks's] employees, agents, contractors or representatives." (Operating Agreement, § 8.) The plain language is broad and does not restrict liability to third-party claims. It encompasses reimbursement for all damages, losses, costs, and expenses that arise in connection with any act or omission of Yellow Banks or arising out of or resulting from the provision of services contemplated by the Operating Agreement. Accordingly, under the language of the Ground Sublease and Operating Agreement, a third-party claim is not a prerequisite to enforcement of these indemnity provisions.

### 2. *Negligence or Gross Negligence*

Yellow Banks argues that the indemnification provisions in question apply only if Yellow Banks acted with ordinary or gross negligence. The Court disagrees. Yellow Banks's obligation to hold harmless and indemnify CHS under the relevant portion of section 8 of the Operating Agreement and section 11 of the Ground Sublease is not conditioned on a finding of Yellow Banks's ordinary or gross negligence. Instead, indemnification under these provisions is required upon a showing that the loss was caused by an act, omission, or provision of services to CHS by Yellow Banks.

Here, it is undisputed that an employee of Yellow Banks left the front-end loader inside the New Warehouse the night of the fire and that the front-end loader ignited the fire inside the New Warehouse. It is further undisputed that the New Warehouse suffered damage as a result of the fire and that CHS paid $146,865.30 to Blue Star Restoration in connection with remediation work necessitated by the fire. CHS suffered damage or loss that arose "indirectly . . . in connection with an act" by an employee of Yellow Banks. (Ground Sublease § 11(b).) Based on these undisputed facts, Yellow Banks is liable for indemnification of the reasonable cost of the fire damage absent another provision in either the Ground Sublease or Operating Agreement relieving Yellow Banks from this contractual provision.

## B. Insurance

Notwithstanding the language of the indemnification provisions, Yellow Banks argues that the Ground Sublease places the responsibility for the fire damage remediation on CHS. Yellow Banks contends that the Ground Sublease specifically requires CHS to maintain fire insurance in amounts equal to the full insurable value of the New Warehouse and improvements and permits replacement of the New Warehouse building to be paid for with proceeds from the required insurance policy. Yellow Banks maintains that where one party to an agreement assumes responsibility for insuring a building against fire loss, it has contracted to bear the risks attendant to the fire loss.

CHS disagrees arguing that Yellow Banks agreed to shoulder responsibility for all losses caused by its acts, omissions, and provision of services to CHS at the terminal, including but not limited to losses caused by fire. According to CHS, nothing in the fire insurance provisions relied upon by Yellow Banks requires CHS to assume responsibility for all losses caused by fire. Furthermore, CHS maintains that nothing in the Ground Sublease or Operating Agreement

requires CHS to make a claim on its fire insurance policy, even if the policy covers a particular loss. CHS contends that it intentionally retained discretion to call on this policy because Yellow Banks agreed to hold harmless and identify CHS from any losses (including fire losses) caused by Yellow Banks. Essentially, the question is whether the Ground Sublease assigns the contractual responsibility to CHS to pay for any fire damage to the New Warehouse.

### 1. *Ground Sublease and Operating Agreement*

Under section 7 of the Ground Sublease, Yellow Banks agreed to perform:

> routine maintenance and preventative maintenance necessary to keep the interior and exterior of the CHS Improvements in good, clean and sanitary condition, and shall make all repairs necessary to keep same in good condition, reasonable wear and tear and damage by fire or other unavoidable casualty only excepted. In the event said building or improvements are damaged or destroyed the same may be replaced or rebuilt from the proceeds of the insurance as provided in Section 10 hereof.

(Ground Sublease § 7(f).)

Under section 8 of the Ground Sublease, CHS agreed to

> perform all replacements of the CHS Improvements or portions thereof that constitute capital expenditures that are necessary to keep same in good condition, reasonable wear and tear and damage by fire or other unavoidable casualty only excepted. In the event said building or improvements are damaged or destroyed the same may be replaced or rebuilt from the proceeds of the insurance as provided in Section 10 hereof.

(Id. at § 8(b).)

Section 10 of the Ground Sublease governs the procurement of insurance by the parties. Section 10(a) requires CHS or its general contractor to obtain "public liability insurance, all risk builder's risk insurance and workmen's compensation insurance to cover every contractor to be employed. . . ." (Id. at 10(a).). Additionally, section 10 also requires CHS "at all times during the Term, and at its expense" to "procure, maintain and keep in force, comprehensive, general

11

liability insurance for claims for bodily or personal injury, death or property damage, occurring in or about the Premises . . . ." (Id.) Section 10 requires CHS to list Yellow Banks as an additional insured under these policies. Section 10 further provides that CHS

> shall at all times during the Term, at its own expense, keep in full force and effect all risk, fire and extended coverage insurance with companies acceptable to [Yellow Banks] . . . in amounts equal to the full insurable value of the buildings including all alterations, additions and improvements. Certificates of such insurance will be delivered to Lessor upon receipt of written request. The policy or policies of insurance will be issued by a company or companies licensed in the State wherein the Premises are situated. In the event of a loss, the proceeds from said insurance policies shall be payable directly to Lessee.

(Id.) Furthermore, Section 10(b) provides that "Lessee shall have the exclusive right to adjust any loss occurring to the building or improvements on the Premises with the insurance companies insuring the buildings and improvements at such time." (Id.)

Section 10(c) provides that Yellow Banks

> at all times during the Term, and at its expense, will procure, maintain and keep in force, comprehensive, general liability insurance for claims for bodily or personal injury, death or property damage, occurring in or about the Premises . . . .

(Id. at § 10(c).) This section required Yellow Banks to have CHS named as an additional insured under the policy. (Id.)

Finally, section 20 of the Ground Sublease provides that "[a]ll insurance policies carried by either party covering the Premises, including but not limited to contents, fire and casualty insurance, shall expressly waive any rights on the part of the insurer against the other party." (Id. at § 20.)

The Operating Agreement further provides that

> CHS agrees to maintain Commercial Property Insurance, written on an All Risk basis, covering its products and building. CHS

>agrees to also maintain Business Automobile Insurance . . . . CHS and [Yellow Banks] will each maintain Property Insurance, written on an All Risk form and covering property owned by the Insured party and property of third parties in the insured party's care, custody and control in amounts adequate to cover the other party's products that are damaged due to negligence of the Insured party. CHS and [Yellow Banks] shall each maintain Commercial General Liability insurance . . . with a limit of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate. . . . CHS and [Yellow Banks] will each name the other party as an additional insured on its Commercial General Liability policy and agrees to provide a waiver of subrogation in favor of the other party with respect to its Commercial General Liability Insurance policy . . . .

(Operating Agreement at § 9.)

### 2. *Purchase of Fire Insurance*

Yellow Banks argues that when one party to a lease agreement assumes responsibility for insuring a building against fire loss, it has contracted to bear all of the risks attendant to the fire loss and cannot maintain an action against the other party, for negligence or otherwise, that may have caused the fire. Diocese of Covington v. Christian Appalachian Project, 787 S.W.2d 704 (Ky. App. 1990); Greenwich Ins. Co. v. Louisville & N.R. Co., 66 S.W. 411 (Ky. 1902).

In Greenwich Ins. Co. v. Louisville & N.R. Co., a railroad company as lessor granted authority to lessee to construct a building on its right of way, expressly conditioned upon the following: "That, in consideration of the premises, said railroad company, its officers, and agents, or other companies operating its railroad, be released and held harmless from, and indemnified against, all claim or demands of said New South Brewing & Ice Company or others on account of any injury or loss whatever to said house or its contents, by reason of fire from locomotives, or from any cause whatsoever." Greenwich, 66 S.W. 411, 412, modified, 112 Ky. 598, 67 S.W. 16 (1902). A fire occurred caused by the negligence of the railroad company's employee. Lessee's cold storage building was damaged, and its insurance company paid the

claim. The insurance company then sought subrogation to recover as the lessee for the negligence of the lessor. The Kentucky Supreme Court held that the lessor railroad company could not be held liable for the cost associated with the fire loss, even if caused by the lessor's negligence, because the lessee had assumed the risk under the terms of the lease agreement.

Relying on Greenwich, the Kentucky Court of Appeals in Diocese of Covington v. Christian Appalachian Project, 787 S.W.2d 704 (Ky. App. 1990), held that where a lease provision requires the lessor of certain property to maintain "fire and extended coverage insurance on the property,"[1] the lessor contracted to bear all risks attendant to fire loss and no action for negligence would lie against lessee. Id. at 704. The Kentucky Court of Appeals noted that based upon the language in Greenwich, "[i]t seems only logical that conversely, a lessor could by contract, assume responsibility for loss by fire thus precluding recovery of damages from its lessee." Id. (citing Rizzuto v. Morris, 592 P.2d 688 (Wash. App. 1979)("[T]he trend of modern case law is to relieve the lessee from liability for fire damage caused by his own negligence where the circumstances lead the court to conclude the parties intended such a result."). See also Tate v. Trialco Scrap, Inc., 745 F.Supp. 458, 473–474 (M.D. Tenn. 1989)(held no right of subrogation where lease provision required lessor to purchase insurance, such provision for mutual benefit of lessor and lessee absent contrary intent).

The remainder of the cases cited by Yellow Banks generally hold that, based on the specific language of the contracts at issue in those cases, the lessor's insurance company has no right of subrogation against a lessee that caused the fire because the parties intended the tenant to be co-insured under the landlord's fire insurance policy.

---

[1] The Court does not have a copy of the exact terms of the lease agreement in question in the Diocese of Covington case.

*c. Discussion*

Yellow Banks argues that these cases mandate summary judgment in its favor because CHS contractually and specifically agreed to purchase insurance to protect against all losses from fire, notwithstanding the indemnity agreement.

An agreement by a party to a lease agreement to purchase a fire insurance policy does not necessarily obligate that party to bear all of the risks associated with a fire loss. Instead, the case law cited by Yellow Banks recognizes that the Court must examine the contents of the lease to determine the intent of the parties. As discussed above, the primary object in construing a contract is to effectuate the intentions of the parties. Cantrell Supply, Inc. v. Liberty Mut. Ins. Co., 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). "Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it if possible." Id. at 384-385 (quoting City of Louisa v. Newland, 705 S.W.2d 916, 919 (Ky. 1986)).

In Sections 7 and 8 of the Ground Sublease, CHS and Yellow Banks agreed that Yellow Banks would perform routine and preventative maintenance and that CHS would perform all capital expenditures. Both parties excepted from these obligations reasonable wear and tear and damage by fire or unavoidable casualty agreeing that "[i]n the event said building or improvements are damaged or destroyed the same may be replaced or rebuilt from the proceeds of the insurance as provided in Section 10 hereof." (Ground Sublease §§ 7, 8.) Section 10 of the Ground Sublease includes numerous provisions requiring *both* CHS and Yellow Banks to purchase certain types of insurance. Specifically, CHS agreed to provide public liability insurance, all risk builder's risk insurance, and workmen's compensation during the construction of the warehouse. CHS and Yellow Banks both agreed to procure, maintain, and keep in force, comprehensive, general liability insurance for claims "for bodily or personal injury, death or

15

property damage, occurring in or about the Premises." (Id. at §§10(a), 10(c).) Finally, CHS agreed to keep "all risk, fire and extended coverage insurance . . . in amounts equal to the full insurable value of the buildings" and in the event of loss the proceeds "from said insurance policies shall be payable directly" to CHS. (Id. at §10(a).) In Section 11 of the Ground Sublease, Yellow Banks agreed to indemnify or reimburse CHS for damages or losses that arise, directly or indirectly, from "any act or omission of" Yellow Banks within the Yellow Banks Premises or otherwise. (Id. at §11(b).)

When viewing the record most favorably to the non-moving party, the Court must conclude that a reasonable person could find the language of Sections 7(f), 8(b), 9, and 10 of the Ground Sublease capable of two inconsistent interpretations.

A reasonable person could construe the Ground Sublease as providing that if a warehouse fire arose from any direct or indirect act or omission of Yellow Banks, then Yellow Banks would be liable for any damage to the warehouse, and further that CHS's agreement to purchase fire insurance does not evidence its intent to shoulder responsibility for *all* harm caused by fire, instead of seeking direct recovery from Yellow Banks. A reasonable inference could be drawn that CHS agreed to only draw upon the proceeds of the fire insurance policy to pay for the repair of the warehouse if the fire did not arise from any act or omission of Yellow Banks and CHS chose to rebuild.

On the other hand, a reasonable person could construe the language contained in Section 10 of the Ground Sublease to require CHS to assume the risk of fire loss. Section 8(b) places the responsibility for replacements of improvements on CHS, except in the event of fire. In that case, the damaged or destroyed improvements may be replaced or rebuilt from the insurance. Section 10 requires CHS to purchase and maintain fire insurance coverage for the property in

question, provides that in the event of a loss by fire the proceeds from the insurance policy shall be payable to CHS, and grants CHS the right to adjust any loss occurring to the building or improvements with the insurance companies.

These reasonable interpretations offered by CHS and Yellow Banks indicate an ambiguity exists. Because the terms of Ground Sublease are ambiguous, extrinsic evidence must be considered to determine the parties' intent. Cantrell Supply, Inc., 94 S.W.3d at 385. Accordingly, summary judgment is not appropriate.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Plaintiff, CHS Inc., for summary judgment [DN 21] and the motion by Defendant, Yellow Banks River Terminal, for summary judgment [DN 26] are **DENIED.**

**IT IS FURTHER ORDERED** that a conference will be conducted by the Magistrate Judge to schedule the remaining discovery in this matter regarding the intent of the parties and the reasonableness of the damages incurred by CHS.

cc: counsel of record
   United States Magistrate Judge